IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES J. ALEXANDER, :
:
    Plaintiff :
: CIVIL ACTION NO. 3:10-00764
v. :
: (JUDGE NEALON)
DELAWARE AND HUDSON RAILWAY :
COMPANY, INC. d/b/a/ CP RAIL, :
:
    Defendant :

MEMORANDUM

On April 12, 2010, Plaintiff, James J. Alexander, filed a complaint against Defendant, Delaware and Hudson Railway. (Doc. 1). The complaint seeks monetary damages under the Federal Employers' Liability Act, 45 U.S.C. § 52 et seq. ("FELA") for personal injuries, namely hearing loss, allegedly suffered by Plaintiff from exposure to excessively loud noises while he was employed with Defendant as a freight conductor. (Doc. 1). Following discovery, on November 29, 2012, Defendant filed a motion for summary judgment, statement of facts, and brief in support. (Docs. 15-18). Plaintiff filed an answer to the statement of facts and brief in opposition on December 28, 2012; Defendant filed a reply brief on February 6, 2013. (Docs. 21-23). In its motion for summary judgment, Defendant argues: A) Plaintiff failed to file this action within the applicable statute of limitations; and B) Plaintiff has failed to establish any evidence to support a claim for loss of wages and earning capacity. (Doc. 15, 16). The motion is now ripe and will be denied for the reasons set forth below.

I.    **STANDARD OF REVIEW**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. National Wildlife Federation, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). All inferences "should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bell Tel. Co., 24 F.3d 508, 512 (3d Cir. 1994) quoting Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## II. STATEMENT OF FACTS

Plaintiff alleges that during the course and scope of his employment with Defendant he was repeatedly exposed to loud noises which resulted in noise induced occupational hearing loss because Defendant failed to provide a safe work environment and failed to provide effective ear protection. (Doc. 17, ¶¶ 2-3) admitted in (Doc. 21, ¶¶ 2-3). Plaintiff further alleges that he has been unable to work as a freight conductor since Defendant removed him from service after medical testing on June 9, 2009, and that he has in the past and will in the future incur medical expenses. (Doc. 17, ¶¶ 4-5) admitted in (Doc. 21, ¶¶ 4-5).

Plaintiff began working on the railroad with Lehigh Valley Railroad in 1968 and finished with Conrail in 1983. (Doc. 17, ¶ 7) admitted in (Doc. 21, ¶ 7). Plaintiff worked in the diesel

shop and in the yard, but after 1976, Plaintiff was mostly an over-the- road conductor on trains. (Doc. 17, ¶ 8) admitted in (Doc. 21, ¶8). In 1983, Plaintiff stopped working for the railroad and went back to school. (Doc. 17, ¶ 9) and (Doc. 21, ¶ 9). Plaintiff made a hearing loss claim against Conrail and Lehigh Valley Railroad, which resulted in Plaintiff receiving $600 and signing a Release Agreement on August 20, 1990. (Doc. 17, ¶ 14) admitted in (Doc. 21, ¶14). The notarized release agreement discharges Lehigh Valley Railroad Company and its affiliated entities and successors from any liability to Plaintiff for present or future hearing loss, impairment, or aggravation or any physical condition related in any fashion thereto. (Doc. 18-4, pp. 1-6). However, Plaintiff testified at his deposition for this matter that he did not recognize the name of his attorney for that matter and did not remember ever being represented by the firm, that he did not remember having made a hearing loss claim, signing a release agreement, or receiving $600. (Doc. 22-5, pp. 11-18).

After a myriad of different jobs, in June of 1998, Plaintiff was hired by Defendant as a brakeman and worked as a yardmaster from 1998 through 2007, and as a conductor from 2007 through 2009. (Doc. 17, ¶10) admitted in (Doc. 21, ¶10). Plaintiff's last day of work with Defendant was June 9, 2009. (Doc. 17, ¶22) admitted in (Doc. 21, ¶22); see also (Doc. 22-4, p. 74) (Plaintiff was taken out of service with Defendant on June 9, 2009.). Daniel Janigo, M.D., in a report dated September 3, 2009, opined that Plaintiff was disabled from hearing loss but would be able to return to railroad work with the use of a hearing amplification device which is shown to be effective. (Doc. 22-13, p. 2).

In 2002, TK Group, Inc. issued a report to Defendant listing audiological examination results from September 10, 2002 which noted asymmetric hearing loss in Plaintiff's left ear.

(Doc. 22-8, p. 2). Subsequently, Defendant's Associate Chief Medical Officer sent Plaintiff a letter dated November 14, 2002 advising him of the test results. (Doc. 22-9, p. 2); see also (Doc. 17, ¶15) and (Doc. 21, ¶15). TK Group, Inc. issued a report to Defendant dated September 9, 2003 which was received by Plaintiff and which indicated a worsening in Plaintiff's hearing levels. (Doc. 22-10, p. 2). Plaintiff contends that the 2003 test results were very similar to the 2002 results. (Doc. 21, ¶15). Plaintiff testified that, from his everyday experiences, he did not know he had hearing loss in 2002 and 2003 and "[d]idn't think anything about it because [he] could hear just fine." (Doc. 22-5, pp. 10, 13, & 18).

On February 29, 2012, the oral deposition of Aaron L. Shapiro, M.D., was taken. (Doc. 22-6). Dr. Shapiro is a 1987 graduate of the University of Pennsylvania School of Medicine and his current practice consists of general otolaryngology (ear, nose and throat medicine), facial plastics, and hearing-loss work. (Doc. 22-6, pp. 6-7). Dr. Shapiro opined, based on the baseline hearing test in 2002, that "I don't believe that that noise exposure had caused significant hearing loss to that point." (Doc. 22-6, pp. 26-27). Dr. Shapiro also opined that, at that point in 2002 and 2003, his hearing loss was consistent with working in an office five hundred (500) feet away from diesel locomotives. (Doc. 22-6, p. 42). Dr. Shapiro stated that assuming Plaintiff read the November 14, 2002 letter, and his 2002 and 2003 audiograms, he would have known he had hearing loss. (Doc. 22-6, p. 38). But again, Dr. Shapiro opined that, as of September 2002, Plaintiff did not have any significant or any occupational noise induced hearing loss. (Doc. 22-6, p. 44). Dr. Shapiro believes that part of Plaintiff's hearing loss was due to working on locomotive engines from 2007 to 2009 and that that hearing loss was 15.6 percent. (Doc. 22-6, p. 27). The audiogram taken by Dr. Shapiro on May 5, 2010 shows greater hearing loss in the

left ear. (Doc. 22-6, p. 28). Dr. Shapiro also stated that a degree of Plaintiff's left-sided hearing loss is due to shooting rifles. (Doc. 22-6, p. 28). In analyzing the audiograms, Dr. Shapiro noted that in 2002 you start to see some effects of noise exposure but the "predominant amount of the loss occurred from the 2007 audiogram to the 2009." (Doc. 22-6, p. 31). Dr. Shapiro believes, based on a May 5, 2010 audiogram and a January 31, 2012 audiogram showing no further deterioration after Plaintiff stopped work, that it was occupational hearing loss. (Doc. 22-6, pp. 47 & 55).

## III. DISCUSSION

### A. Statute of Limitations

"No action shall be maintained under [the FELA] unless commenced within three years from the day the cause of action accrued." 45 U.S.C. § 56. When dealing with an occupational illness which has an indefinite beginning and which progresses insidiously over many years, the cause of action accrues "when the employee becomes aware of his disease and its cause." Kichline v. Consolidated Rail Corp., 800 F.2d 356, 358 (3d Cir. 1986), citing Urie v. Thompson, 337 U.S. 163, 169, 93 L. Ed. 1282, 69 S. Ct. 1018 (1949) and Young v. Clinchfield R.R. Co., 288 F.2d 499 (4th Cir. 1961). "Under the F.E.L.A., a plaintiff's claim does not accrue until the plaintiff knows, or should have known of his condition and its cause." In re Central R.R. Co., 950 F.2d 887, 891 n.3 (3d Cir. 1991). In other words, "the statute of limitations begins to run on the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." Kichline, 800 F.2d at 359, citing Zeleznik v. United States, 770 F.2d 20, 23 (3d Cir. 1985) and Fletcher v. Union Pacific R. R. Co., 621 F.2d 902, 906-07 (8th Cir. 1980). "Whether

5

the statute has run on a claim is usually a question of law for the trial judge, but where the issue involves a factual determination, the determination is for the jury." Knopick v. Connelly, 639 F.3d 600, 606 (3d Cir. 2011), certiorari denied Downey v. Knopick, 2012 U.S. LEXIS 784 (U.S., Jan. 17, 2012). When a jury could disagree as to exactly when an injured party knew or should have known of his or her injury, judgment as a matter of law based on the statute of limitations is inappropriate. Id. at 616.

Defendant argues that Plaintiff was made aware that he had a hearing loss in 2002 when he received a letter advising him, based on the September 10, 2002 audiological hearing examination, that he had moderate to severe asymmetrical hearing loss in his left ear. (Doc. 23, p. 6). Defendant also submits that Plaintiff was further made aware of his hearing loss when he received the results of a September 9, 2003 hearing report showing a worsening in hearing levels from the 2002 test. (Doc. 23, p. 6). Defendant highlights that Plaintiff signed a release agreement and received a $600 settlement for hearing loss with a railroad employer in the past, thus evidencing Plaintiff's awareness that work on the railroad could result in hearing loss. (Doc. 23, p. 7).

Viewing the facts in the light most favorable to Plaintiff, there is a question of fact as to whether Plaintiff knew or should have known in 2002 and 2003 that he had hearing loss that could have been caused by Defendant. Plaintiff testified that, from his everyday experiences, he did not know he had hearing loss in 2002 and 2003 and "[d]idn't think anything about it because [he] could hear just fine." (Doc. 22-5, pp. 10, 13 & 18). Dr. Shapiro testified, based on the baseline hearing test in 2002, that "I don't believe that that noise exposure had caused significant hearing loss to that point." (Doc. 22-6, pp. 26-27). Dr. Shapiro opined that, as of September

6

2002, Plaintiff did not have any significant or any occupational noise induced hearing loss. (Doc. 22-6, p. 44). In analyzing all of the audiograms including the 2002 and 2003 tests, Dr. Shapiro noted that in 2002 you start to see some effects of noise exposure but the "predominant amount of the loss occurred from the 2007 audiogram to the 2009." (Doc. 22-6, p. 31).

With regard to the prior settlement with Conrail and Lehigh Valley Railroad, Plaintiff testified that he did not recognize the name of his attorney or remember ever being represented by the firm and that he did not remember ever having made a hearing loss claim, signing a release agreement, or receiving $600. (Doc. 22-5, pp. 11-18). The settlement amount of $600 supports the credibility of Plaintiff's statement regarding his lack of recollection and Plaintiff's theory that these settlements may have been something that "the railroad did routinely when people left their employ." (Doc. 22, p. 11); (Doc. 22-6, pp. 44-45); see also Wicker v. Conrail, 142 F.3d 690, 701 (3d Cir. 1998) (finding releases invalid). However, Plaintiff testified that, upon his initial employment with Defendant when reviewing Defendant's Employee Safety Code and Policy, he checked "yes" on the box which asked if he ever had a noisy job before and indicated from 1968 to 1983 which was his time with Lehigh Valley Railroad and Conrail. (Doc. 22-5, pp. 4-5). Plaintiff also similarly marked another of Defendant's forms when given a hearing test in 2007. (Doc. 22-5, pp. 5-6). This gives credence to Defendant's assertion that Plaintiff was aware of his hearing loss and that it might be caused by working on the railroad. However, having fully analyzed all of the evidence set forth in the light most favorable to Plaintiff, it is determined that there is a factual dispute here for determination by a jury. Reasonable jurors could differ as to whether Plaintiff was injured in 2002 and 2003 and also could differ as to whether Plaintiff should have been aware of any hearing loss he had in 2002

7

and 2003. Accordingly, summary judgment is inappropriate and the decision is left for the jury.

If a jury determines that Plaintiff had knowledge of his injury and its cause more than three years before Plaintiff filed this suit on April 12, 2010, Plaintiff would have no claim for physical injuries which occurred more than three years before said date. See Kichline, 800 F.2d at 361. However, Plaintiff would still have a claim for damages for the aggravation of his physical condition that occurred after April 12, 2007 until his departure from Defendant's employ on June 9, 2009. Id. ("If the plaintiff can establish the railroad's negligence, he would be entitled to claim damages for the aggravation of his physical condition" between the applicable dates and the "burden to establish the extent of the injury occurring during the relevant period is on plaintiff."). Again, Dr. Shapiro has opined, based on Plaintiff's audiograms, that the "predominant amount of the loss occurred from the 2007 audiogram to the 2009." (Doc. 22-6, p. 31). Accordingly, if a jury finds that Plaintiff knew or should have known of his hearing loss and its cause in 2002 or 2003, Plaintiff would still have a claim for the alleged aggravation of hearing loss after April 12, 2007.

### B. Sufficiency of Plaintiff's Evidence

Defendant argues that Plaintiff has set forth no evidence that he has suffered past wage loss or loss of earning capacity as a result of hearing loss due to noise exposure with the railroad. (Doc. 16, p. 8), citing Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1284 (3d Cir. 1995) (A plaintiff must "produce competent evidence suggesting that his injuries narrowed the range of economic opportunities available to him."). Defendant submits that it offered to provide Plaintiff with $1,000 to obtain hearing aids but that Plaintiff made no attempts to go back to work on the railroad or anywhere else and that Plaintiff has not offered any

8

evidence that his hearing loss has prevented him from obtaining other work. (Doc. 16, p. 9); see also (Doc. 23, p. 8). Further, Defendant argues that Plaintiff did not need hearing aids to return to work as a yardmaster. Id. Defendant requests summary judgment as it believes Plaintiff is unable to establish an essential element of its claim, namely economic loss damages. (Doc. 16, p. 10).

In response, Plaintiff argues that even if Plaintiff cannot maintain a claim for lost wages or lost earning capacity, he still has an action for the injury of hearing loss. (Doc. 22, p. 16). Plaintiff specifically responds to Defendant's offer to pay $1000 towards hearing aids by highlighting Plaintiff's testimony that his uncle's hearing aids cost $8,000, and Plaintiff argues that Defendant left Plaintiff to fend for himself and did not provide hearing aids or recommend any as "FRA approved." (Doc. 22, p. 17). Further, Plaintiff argues that he no longer had seniority or was qualified as a yardmaster and therefore, could not return to work in that capacity. (Doc. 22, pp. 17-18). Lastly, Plaintiff describes the caselaw cited by Defendant as inapplicable here and argues that Defendant has failed to show that there is a lack of genuine issue of material fact as to Plaintiff's loss of wages and earning capacity. (Doc. 22, p. 18).

In his complaint, Plaintiff sets forth a cause of action under the FELA alleging that he was repeatedly exposed to loud noise levels which resulted in noise induced occupational hearing loss due to Defendant's failure to provide Plaintiff with a safe work environment and other acts of negligence. (Doc. 1, ¶ 7). Plaintiff further alleges that as a result of Defendant's negligence he has been unable to work as a freight conductor with Defendant since June 10, 2009, he has incurred substantial medical expenses, he has suffered loss of past and future earnings and an impairment of earning capacity, and has sustained past and future pain and suffering. (Doc. 1,

9

pp. 8-11).

The FELA "provides a broad basis for recovery, as it recites that 'every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .'" Holliday v. Conrail, 914 F.2d 421, 423 (3d Cir. 1990), citing 45 U.S.C. § 51. The United States Supreme Court has "recognized generally that the FELA is a broad remedial statute, and ha[s] adopted a 'standard of liberal construction in order to accomplish [Congress'] objectives.'" Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 562, 94 L. Ed. 2d 563, 107 S. Ct. 1410 (1987) (citations omitted). The FELA has a more lenient standard of causation and negligence than ordinary tort actions. Hines v. Conrail, 926 F.2d 262, 264-65 (3d Cir. 1991).

Here, Daniel Janigo, M.D., in a report dated September 3, 2009, opined that Plaintiff was disabled from hearing loss. (Doc. 22-13, p. 2). Plaintiff stated that he is currently having hearing problems and the first time he realized this was in February of 2009. (Doc. 22-5, pp. 54-55). Plaintiff testified that he has trouble discerning certain sounds and people talking in everyday conversations. (Doc. 22-5, pp. 18-19). He has constant ringing in both ears which has been getting louder and louder. (Doc. 22-5, pp. 84-85). Plaintiff occasionally turns his right ear forward to hear people. Dr. Shapiro testified that part of Plaintiff's hearing loss was due to working on locomotive engines from 2007 to 2009 and that that hearing loss was 15.6 percent. (Doc. 22-6, p. 27). Dr. Shapiro believes, based on a May 5, 2010 audiogram and a January 31, 2012 audiogram showing no further deterioration after he stopped work, that it was occupational

hearing loss. (Doc. 22-6, pp. 47 & 55). Based on this evidence alone, Plaintiff has set forth enough evidence that a reasonable jury could conclude that Plaintiff suffered occupational hearing loss while employed by Defendant.

With regard to the lost wages claim, "[a] plaintiff in a FELA case may recover damages for the loss of future earning capacity if his injuries 'have narrowed the range of economic opportunities available to him.'" Colyer v. Conrail, 114 Fed. Appx. 473, 481 (3d Cir. 2004), citing Gorniak v. Nat'l R.R. Passenger Corp., 889 F.2d 481, 484 (3d Cir. 1989) (emphasis added). "A plaintiff must show 'that his injury has caused a diminution in his ability to earn a living,' which may occur through a 'decreased ability to weather adverse circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment.'" Colyer, 114 Fed. Appx. at 482, citing Gorniak, 889 F.2d at 484. The United States Third Circuit Court of Appeals has never required "evidence as to the likelihood of finding other jobs at a similar salary level" but has had "faith in the jury's ability to weigh various factors affecting a potential loss of future earning capacity when a plaintiff shows that his injuries have foreclosed some potential employment opportunities." Colyer, 114 Fed. Appx. at 483. A plaintiff does not necessarily need expert, vocational testimony and need only demonstrate that "his economic prospects have been narrowed." Id. at 485. This can be established through a plaintiff's own testimony and by expert medical testimony as to a plaintiff's physical limitations. Id.

Here, Plaintiff testified that Defendant prevented Plaintiff from further work on June 9, 2009 and that he never wanted to stop working. (Doc. 22-4, p. 74); (Doc. 22-5, pp. 32, 41-42, 45, 74-76). Plaintiff further testified that he was informed verbally that he needed a digital hearing aid if he wanted to return to work with Defendant. (Doc. 22-5, p. 28). In approximately

11

May or early June of 2009, Defendant's medical personnel had sent Plaintiff some "Bilson" hearing protection ("big yellow things") but when Plaintiff returned to work Defendant informed him that he could not wear them while he was working. (Doc. 22-5, pp. 46, 50, 73-76). Subsequently, Defendant contacted Plaintiff and informed him that new hearing protection had been obtained, however, when Plaintiff got to work at first "they couldn't figure out how to put it together" but eventually they conducted a field hearing test which Plaintiff failed. (Doc. 22-5, pp. 47, 73-76). Plaintiff was informed that he was out of service. (Doc. 22-5, p. 76).

Plaintiff received a letter from Defendant stating that they would grant him $1,000 to purchase an effective, FRA digital hearing device. (Doc. 22-5, p. 35). Plaintiff stated that he looked online but did not obtain a hearing aid as he did not know what to get and could not find one that would be FRA approved. (Doc. 22-5, pp. 28-31). Plaintiff also testified, based upon being informed by his uncle who wears hearing aids, that they cost approximately $8,000 and he was thus financially prevented from obtaining sufficient hearing aids. (Doc. 22-5, pp. 36-37). Plaintiff stated that if he received the proper hearing aids he would probably return to working on the railroad. (Doc. 22-5, p. 37). One of Plaintiff's prior railroad employers, Conrail, provided hearing protection which Plaintiff always wore. (Doc. 22-4, p. 35). While Plaintiff worked on a crew as a conductor making runs he wore the "sponge type" hearing protection provided by Defendant. (Doc. 22-4, pp. 98-99).

With regard to Plaintiff's ability to find other work, Plaintiff testified that he first left his position with the railroad in approximately 1983 because the economy had slowed down and that he went to work in other places as a bar owner and bartender, drafting machine diagrams, construction site manager, and salesman, but made "a lot less" than railroad work so he made

attempts to be rehired by Conrail and was eventually hired by Defendant in June of 1998. (Doc. 22-4, pp. 45-46, 52-56). Plaintiff testified that he could not return to drafting work because the industry has changed with technology. (Doc. 22-4, p. 58). In 2007, Plaintiff applied to return to work as a yardmaster for Defendant but was refused. (Doc. 22-5, p. 108). Plaintiff testified that Defendant's retirement board has him listed as disabled but that he is going to have to find a job and thought he may try Walmart. (Doc. 22-4, p. 61).

The testimony of Plaintiff and Dr. Shapiro summarized above, and the report of Dr. Janigo opining that Plaintiff is unable to work, present a question of material fact which is more appropriate for a jury. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's hearing loss has "narrowed the range of economic opportunities available to him." Colyer, 114 Fed. Appx. at 481, citing Gorniak, 889 F.2d at 484. Accordingly, Defendant's motion for summary judgment will be denied.

## IV. Conclusion

Genuine issues of material fact exist as to whether Plaintiff reasonably should have been aware of his hearing loss in 2002 or 2003 and as to whether his hearing loss has narrowed the range of economic opportunities available to him. Accordingly, these questions are appropriate for a jury and Defendant's motion for summary judgment will be denied.

United States District Judge

Date: April 30, 2013

13

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES J. ALEXANDER,

    Plaintiff

    v.

DELAWARE AND HUDSON RAILWAY
COMPANY, INC. d/b/a/ CP RAIL,

    Defendant

CIVIL ACTION NO. 3:10-00764

(JUDGE NEALON)

**FILED
SCRANTON**

APR 3 0 2013

PER _____
DEPUTY CLERK

**ORDER**

**NOW, THIS 30th DAY OF APRIL, 2013**, for the reasons set forth in this Court's MEMORANDUM of this date, **IT IS HEREBY ORDERED AND DECLARED THAT** Defendant's motion for summary judgment (Doc. 15) is **DENIED**.

_____
United States District Judge